1  EDMUND G. BROWN JR.
   Attorney General of the State of California
2  DANE R. GILLETTE
   Chief Assistant Attorney General
3  GERALD A. ENGLER
   Senior Assistant Attorney General
4  PAMELA K. CRITCHFIELD
   Deputy Attorney General
5  JOHN H. DEIST, State Bar No. 136469
   Deputy Attorney General
6    455 Golden Gate Avenue, Suite 11000
     San Francisco, CA  94102-7004
7    Telephone:  (415) 703-5855
     Fax:  (415) 703-1234
8    Email: John.Deist@doj.ca.gov

9  Attorneys for Respondent

10            IN THE UNITED STATES DISTRICT COURT

11          FOR THE NORTHERN DISTRICT OF CALIFORNIA

12                  SAN FRANCISCO DIVISION

13
    **RUBEN E. VASQUEZ,**                          C 07-4250 WHA (PR)
14
                                 Petitioner,
15
           **v.**
16
    **THOMAS FELKER, Warden,**
17
                                 Respondent.
18

19
    **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ANSWER TO**
20  **PETITION FOR WRIT OF HABEAS CORPUS**

21

22

23

24

25

26

27

28

1

**TABLE OF CONTENTS**

2

**Page**

3   STATEMENT OF THE CASE                                                                          1

4   STATEMENT OF FACTS                                                                             2

5   THE STANDARD OF REVIEW                                                                         3

6   ARGUMENT                                                                                       4

7       I.      THE TRIAL COURT PROPERLY DISMISSED SEVERAL
                JURORS DURING VOIR DIRE BECAUSE THEY HAD FAILED
8               TO DISCLOSE THEIR CRIMINAL BACKGROUNDS ON
                THEIR JUROR QUESTIONNAIRES                                                         4
9
                A.   Background                                                                    5
10
                B.   A Juror Who Provides False Information During Voir Dire May Be
11                   Dismissed For Cause                                                           6

12              C.   The Improper Dismissal Of Jurors For Cause Does Not Require Reversal Of
                     Petitioner's Conviction                                                       8
13
        II.     THE TRIAL COURT WAS NOT REQUIRED TO QUESTION
14              THE JURORS ABOUT THEIR CRIMINAL BACKGROUNDS
                BEFORE DISMISSING THEM FOR CAUSE                                                  10
15
        III.    THE PROSECUTOR'S CHALLENGES FOR CAUSE WERE
16              NOT RACIALLY DISCRIMINATORY                                                       12

17      IV.     THE TRIAL COURT PROPERLY EVALUATED AND DENIED
                PETITIONER'S *BATSON/WHEELER* MOTIONS                                             12
18
                A.   *Batson/Wheeler* Motions                                                     13
19
                B.   The State Court Proceedings                                                  15
20
                C.   Each Of The Prosecutor's Peremptory Challenges Was Supported By
21                   Multiple Race-Neutral Reasons                                                16

22                   Mr. Jackson                                                                  16

23                   Mr. Norman                                                                   19

24                   Ms. Jasper                                                                   20

25                   Mr. Webster                                                                  21

26                   Mr. Massey                                                                   22

27                   Mr. Thompson                                                                 24

28                   Mr. Barnes                                                                   24

**TABLE OF CONTENTS  (continued)**

Page

Ms. Scruggs ........................................................... 25

Ms. Gibson ........................................................... 26

D.  Other Arguments ........................................ 27

CONCLUSION ................................................................. 29

1

**TABLE OF AUTHORITIES**

2
                                                                            **Page**

3   **Cases**

4   *Abbott v. Mines*
    411 F.2d 353 (6th Cir. 1969)                                              11
5
    *Bains v. Cambra*
6   204 F.3d 964 (9th Cir. 2000)                                               4

7   *Batson v. Kentucky*
    476 U.S. 79, 84-89 (1986)                                 13, 14, 15, 27, 28
8
    *Boyde v. Brown*
9   404 F.3d 1159 (9th Cir. 2005)                                             16

10  *Brecht v. Abrahamson*
    507 U.S. 619 (1993)                                                        4
11
    *Burks v. Borg*
12  27 F.3d 1424 (9th Cir. 1994)                                              14

13  *Chapman v. California*
    386 U.S. 18 (1967)                                                        28
14
    *Davis v. Minnesota*
15  (1994) 511 U.S. 1115                                                      19

16  *Dragovich v. Slosson*
    110 Cal.App.2d 370 (1952)                                                  9
17
    *Elem v. Purkett*
18  64 F.3d 1195 (8th Cir. 1995)                                              20

19  *Fein v. Permanente Medical Group*
    38 Cal.3d 137 (1985)                                                       9
20
    *Frazier v. United States*
21  335 U.S. 497 (1948)                                                        7

22  *Hernandez v. New York*
    500 U.S. 352 (1991)                                                       13
23
    *In re Hitchings*
24  (1993) 6 Cal.4th 97                                                        8

25  *J.E.B. v. Alabama ex rel. T.B.*
    (1994) 511 U.S. 127                                                       19
26
    *Jordan v. Lefevre*
27  293 F.3d 587 (2d Cir. 2002)                                               20

28

**TABLE OF AUTHORITIES  (continued)**

**Page**

*Lockhart v. McCree*
476 U.S. 162 (1986)                                                      10, 11

*Matthews v. Evatt*
105 F.3d 907 4th Cir. 1997)                                              16, 18

*McClain v. Prunty*
217 F.3d 1209 (9th Cir. 2000)                                            18

*McDonough Power Equipment, Inc. v. Greenwood*
464 U.S. 548 (1984)                                                      7

*Messiah v. Duncan*
435 F.3d 186 (2d Cir. 2006)                                              25

*Miller-El v. Cockrell*
537 U.S. 322 (2003)                                                      13

*Miller-El v. Dretke*
545 U.S. 231 (2005)                                                      14

*Murphy v. Dretke*
416 F.3d 427 (5th Cir. 2005)                                             18

*Paulino v. Castro*
371 F.3d 1083 (9th Cir. 2004)                                            28

*Penry v. Johnson*
532 U.S. 782 (2001)                                                      4

*People v. Alvarez*
14 Cal.4th 155 (1996)                                                    17, 24

*People v. Ashmus*
54 Cal.3d 932 (1991)                                                     11

*People v. Ayala*
24 Cal.4th 243 (2000)                                                    28

*People v. Heard*
31 Cal.4th 946 (2003)                                                    11

*People v. Holt*
15 Cal.4th 619 (1997)                                                    9

*People v. Howard*
1 Cal.4th 1132 (1992)                                                    9

*People v. Johnson (Jay Shawn)*
30 Cal.4th 1302, 1309 (2003)                                             27

**TABLE OF AUTHORITIES  (continued)**

**Page**

*People v. Johnson*
6 Cal.4th 1 (1993)                                          8, 11, 14

*People v. Morris*
53 Cal.3d 152 (1991)                                        8, 9

*People v. Price*
1 Cal.4th 324 (1991)                                        5, 8

*People v. Schmeck*
37 Cal.4th 240 (2005)                                       14, 15

*People v. Silva*
25 Cal.4th 345 (2001)                                       17

*People v. Stewart*
(2004) 33 Cal.4th 425                                       10

*People v. Watson*
46 Cal.2d 818 (1956)                                        28

*People v. Wheeler*
22 Cal.3d. 258 (1978)                                       13, 15, 23, 27

*People v. Williams*
16 Cal.4th 153 (1997)                                       17

*Pitsonbarger v. Gramley*
141 F.3d 728 (7th Cir. 1998)                                16

*Rice v. Collins*
546 U.S. 333 (2006)                                         14, 15, 21, 22

*Stubbs v. Gomez*
189 F.3d 1099 (9th Cir. 1999)                               23

*Tolbert v. Gomez*
190 F.3d 985 (9th Cir. 1999)                                16, 20

*Turner v. Marshall*
121 F.3d 1248 (9th Cir. 1997)                               15

*U. S. v. Torres*
128 F.3d 38 (2d Cir. 1997)                                  7

*U.S. v. Annigoni*
96 F.3d 1132 (9th Cir. 1996)                                8

**TABLE OF AUTHORITIES  (continued)**

| | Page |
|---|---|
| *U.S. v. Blackman*<br>66 F.3d 1572 (11th Cir. 1995) | 8 |
| *U.S. v. Buckhalter*<br>986 F.2d 875 (5th Cir. 1993) | 8 |
| *U.S. v. Changco*<br>1 F.3d 837 (9th Cir. 1993) | 20 |
| *U.S. v. Cobb*<br>185 F.3d 1193 (11th Cir. 1999) | 20, 25 |
| *U.S. v. Jimenez*<br>77 F.3d 95 (5th Cir. 1995) | 18 |
| *U.S. v. Joseph*<br>892 F.2d 118 (D.C. Cir. 1989) | 9 |
| *U.S. v. Lorenzo*<br>995 F.2d  1448 (9th Cir. 1993) | 20 |
| *U.S. v. Smith*<br>223 F.3d 554 (7th Cir. 2000) | 19 |
| *United States v. Calhoun*<br>542 F.2d 1094 (9th Cir. 1976) | 9 |
| *United States v. Chinchilla*<br>874 F.2d 695 (9th Cir. 1989) | 14 |
| *United States v. Steele*<br>178 F.3d 1230 (11th Cir. 1999) | 21, 22, 26 |
| *United States v. Wood*<br>299 U.S. 123 (1936) | 7 |
| *Wainwright v. Witt*<br>469 U.S. 412 (1985) | 10, 11, 16 |
| *Washington v. Johnson*<br>90 F.3d 945 (5th Cir. 1996) | 24, 25 |
| *Williams v. Rhoades*<br>354 F.3d 1101 (9th Cir. 2004) | 21 |
| *Williams v. Taylor*<br>529 U.S. 362 (2000) | 3, 4 |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**TABLE OF AUTHORITIES  (continued)**

|  | Page |
|---|---|
| **Statutes** | |
| United States Code, Title 28 | |
| § 2254(d) | 3, 7, 10 |
| § 2254(d)(1) | 3 |
| § 2254(d)(2) | 14 |
| § 2245(e)(1) | 14 |
| California Code of Civil Procedures | |
| § 225 | 7 |
| § 229 | 7 |
| California Penal Code | |
| § 187 | 1 |
| § 190.2, subdivision (a)(17)(A) | 1 |
| § 12022.53, subdivision (d) | 2 |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1  EDMUND G. BROWN JR.
   Attorney General of the State of California
2  DANE R. GILLETTE
   Chief Assistant Attorney General
3  GERALD A. ENGLER
   Senior Assistant Attorney General
4  PAMELA K. CRITCHFIELD
   Deputy Attorney General
5  JOHN H. DEIST, State Bar No. 136469
   Deputy Attorney General
6    455 Golden Gate Avenue, Suite 11000
     San Francisco, CA  94102-7004
7    Telephone:  (415) 703-5855
     Fax:  (415) 703-1234
8    Email:  John.Deist@doj.ca.gov

9  Attorneys for Respondent

10              IN THE UNITED STATES DISTRICT COURT

11          FOR THE NORTHERN DISTRICT OF CALIFORNIA

12                  SAN FRANCISCO DIVISION

13
   RUBEN E. VASQUEZ,                          C 07-4250 WHA (PR)
14
                            Petitioner,       **MEMORANDUM OF POINTS
15                                            AND AUTHORITIES IN
                         v.                   SUPPORT OF ANSWER TO
16                                            PETITION FOR WRIT OF
   THOMAS FELKER, Warden,                     HABEAS CORPUS**
17
                            Respondent.
18

19

20                  **STATEMENT OF THE CASE**

21        On February 3, 2003, petitioner Ruben Eliceo Vasquez and two codefendants, Miguel

22 Galindo Sifuentes and Hai Minh Le, were convicted by jury in the Alameda County Superior Court

23 of first degree murder, in violation of California Penal Code section 187.[1/]  Clerk's Transcript on

24 Appeal (CT), attached hereto as Exhibit 1, at 1861-1874.  The jury also found true three special

25 circumstances pertaining to petitioner, making him eligible for the death penalty: (1) he committed

26 the murder during the course of a robbery (§ 190.2, subd. (a)(17)(A)); (2) he committed the murder

27

28        1.  Unless otherwise indicated, all statutory references are to the Penal Code.

   Memorandum of Ps and As in Support of Answer, *Vasquez v. Felker*, - C 07-4250 WHA (PR)
                                      1

1   during the course of a burglary (*id.*, subd. (a)(17)(G)); and (3) he murdered a peace officer (*id.*, subd.

2   (a)(7)).  CT 1861-1874.  The jury also found that petitioner had personally used a firearm during the

3   commission of the murder (§ 12022.53, subd. (d)).  CT 1861-1874.

4        The jury was unable to reach a verdict in the penalty phase of petitioner's trial, so the trial

5   court declared a mistrial.  CT 3690, 3730.  On June 11, 2003, the court sentenced petitioner to life

6   in prison without the possibility of parole.  CT 2014, 3784-3789.

7        Petitioner's conviction was affirmed by the California Court of Appeal in an unpublished

8   opinion filed on January 31, 2006.  Exhibit 7.  Petitioner petitioned for review to the California

9   Supreme Court on March 9, 2006.  Exhibit 8.  That petition was denied without comment on May

10  17, 2006.  Exhibit 9.

11       On August 20, 2007, petitioner filed in this Court a federal petition for writ of habeas

12  corpus.  On August 27, 2007, this Court ordered respondent to answer the petition.

13                              **STATEMENT OF FACTS**[2/]

14       At approximately 10:50 p.m. on December 11, 1998, defendants Vasquez, Sifuentes, and

15  Le went to the Outback Restaurant in Dublin to commit a robbery.  Sifuentes entered the restaurant

16  and asked for a table.  He told the server that he was waiting for friends and ordered a soda.

17  Approximately half an hour later, the server prompted Sifuentes to place an order.  Sifuentes was

18  subsequently presented with a bill.  He told the server that he needed to get some money from his

19  car.  As he was about to leave the restaurant, Vasquez and Le entered.  Le pulled out a pellet gun and

20  marched a departing customer back into the restaurant, telling him, "This is what I do."  Defendants

21  spread out through the restaurant and commandeered the remaining customers and employees to the

22  kitchen area.  In the process, Vasquez robbed a man of his wallet.

23       Vasquez was armed with a nine-millimeter Sig Sauer P226 semiautomatic pistol, while

24  

25       2.  Our summary of the facts of petitioner's crime is taken from the opinion of the Court of

26  Appeal, with minor stylistic changes.  *See* Exhibit 7 at 2-3.  A more extensive summary, with
    citations to the record, may be found in Respondent's Brief on Appeal, attached hereto as Exhibit

27  6.  The summary presented here is relatively brief because it has only marginal relevance to the
    issues presented on habeas, and petitioner did not dispute at trial that he was guilty of first degree

28  felony murder.

Memorandum of Ps and As in Support of Answer, *Vasquez v. Felker*, - C 07-4250 WHA (PR)

1  Sifuentes and Le were armed with pellet guns. In the kitchen, Vasquez demanded money and fired

2  his gun into a fryer on one side of the kitchen. Vasquez took the manager to his office where he

3  stuffed his pockets with money from the cash drawer. While they were in the office, the telephone

4  rang. Vasquez threatened the manager to tell the police that everything was all right or he would be

5  killed. The manager complied with Vasquez's order. Meanwhile, an employee called 911 and hung

6  up as the three men ordered the employees and customers into the restaurant's walk-in refrigerator.

7  Another employee was able to activate a security device before being placed in the refrigerator.

8  Deputy Sheriff Angela Schwab responded to the 911 call, but was told by the dispatch

9  operator that the restaurant manager had reported that everything was okay. Schwab entered the

10  restaurant and was surprised by Vasquez. Vasquez pointed his gun at Schwab and demanded that

11  she give him her gun. After Vasquez hit Schwab in the face, he took her gun. Le put a gun to her

12  back and he and Sifuentes walked her to the back of the restaurant.

13  Deputy Monego arrived on the scene. As he was entering a door to the restaurant, Vasquez

14  shot him. Vasquez fired additional shots at Monego after he had fallen to the ground. The police

15  recovered four expended cartridges in the foyer of the restaurant and three others outside the door

16  to the restaurant, all shot from Vasquez's pistol. The men fled the scene and were apprehended

17  shortly thereafter.

18  At trial, Vasquez's defense was that the shooting was inadvertent, instinctive or accidental,

19  while the prosecutor sought to prove that the shooting was an "execution" and intentional.

20  **THE STANDARD OF REVIEW**

21  The petition is governed by the Antiterrorism and Effective Death Penalty Act of 1996

22  (AEDPA). *See* 28 U.S.C. § 2254(d); *Williams v. Taylor,* 529 U.S. 362, 412 (2000). Under AEDPA,

23  a federal court has no authority to grant habeas relief unless the last reasoned decision of the state

24  courts was "contrary to, or involved an unreasonable application of," clearly established Supreme

25  Court precedent. 28 U.S.C. § 2254(d)(1).

26  A state court's decision is "contrary to" law if the state court arrives at a conclusion

27  opposite to that reached by the Supreme Court on a question of law, or reaches a different conclusion

28  based on facts materially indistinguishable from a Supreme Court case. *Williams,* 529 U.S. at 413.

1 A state court's decision constitutes an "unreasonable application" of Supreme Court precedent if the

2 state court identifies the correct governing legal principles, but the application of law to the facts is

3 objectively unreasonable. *Id.* An unreasonable application is different from an incorrect or

4 erroneous application of federal law. *Id.* at 412. Accordingly, "a federal habeas court may not issue

5 the writ simply because that court concludes in its independent judgment that the relevant state-court

6 decision applied clearly established federal law erroneously or incorrectly. Rather, that application

7 must also be unreasonable." *Id.* at 411; *accord, Penry v. Johnson,* 532 U.S. 782 (2001). The federal

8 constitutional right allegedly infringed by the state court ruling must be one that had been clearly

9 established by holdings of the United States Supreme Court at the time the state court acted. *See*

10 *Williams*, 529 U.S. at 412.

11       Even if the state court's ruling is clearly contrary to or an unreasonable application of

12 Supreme Court precedent, such an error would justify overturning the conviction only if the error

13 had a "'substantial and injurious effect or influence in determining the jury's verdict.'" *Penry v.*

14 *Johnson,* 532 U.S. at 795, quoting *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993); *see also Bains*

15 *v. Cambra*, 204 F.3d 964, 977 (9th Cir. 2000) (*Brecht* standard applies in all § 2254 cases).

16 **ARGUMENT**

17 **I.**

18 **THE TRIAL COURT PROPERLY DISMISSED SEVERAL JURORS**
**DURING VOIR DIRE BECAUSE THEY HAD FAILED TO DISCLOSE**
19 **THEIR CRIMINAL BACKGROUNDS ON THEIR JUROR**
**QUESTIONNAIRES**[3/]

20

21       Petitioner contends the trial court erred in dismissing for cause a number of prospective

22 jurors who had failed to disclose prior arrests or convictions on their juror questionnaires. The

23 dismissals were valid because they were based on a neutral, legitimate criterion. Moreover, even if

24 the dismissals were improper, petitioner's right to an impartial jury was not diminished.

25 ─────────────────────────────────────────────

26     3. Petitioner's federal habeas claims are presented on the basis of his petition for review to
the California Supreme Court. Exhibit 8. The petition for review was based, in turn, on petitioner's
27 opening brief to the Court of Appeal. Exhibit 4. In the petition for review, petitioner changed the
order of presentation of his first two claims. We believe those claims were presented more logically
28 to the Court of Appeal, so we address them in that order.

## A.    Background

Prior to trial, the defense attorneys filed a joint discovery motion, requesting that the prosecutor disclose arrest records ("rap sheets") of all prospective jurors.  *See* CT 402-405.  The court observed that the disclosure of rap sheets is illegal, but nonetheless ordered the prosecutor to disclose "any misdemeanor convictions or any arrests" a potential juror may have suffered.  RT 1353-1354.

On April 25, 2002, the court reviewed with the attorneys a questionnaire which would be distributed to all prospective jurors.  *See* RT 2246-2303.  One section of the questionnaire dealt with the criminal justice system.  Question number 10 asked the jurors, "Have you, any family member or close friend ever been **accused of, arrested for, charged with or convicted of** any crime?  If yes, please explain."  Juror Questionnaire, page 7 (bold text in questionnaire); *see also* RT 2283; Exhibit 3.  The court told the attorneys it considered this question particularly important:

> I allude specifically to that question because I can tell you now that if anybody—if the District Attorney determines that somebody was in fact arrested for a crime, didn't put it down—and I tell them drunk driving, too—or doesn't put down the fact that they were arrested for a crime, charged with a crime or convicted of any crime, no matter how minor it is, under *People vs. Wright*,[4] that's a challenge for cause and they'll be excused.

RT 2283-2284.

The next day, the court solicited comments on the questionnaire from the attorneys.  No comment was made regarding Question 10.  *See* RT 2297-2303.

The front page of the questionnaire instructed the jurors as follows:

> When answering these questions, please keep in mind that you are sworn to tell the truth and that your answers are given under penalty of perjury.  It is important that you answer the questions as completely and as honestly as possible.  This will reduce the time necessary for questioning in court.  You will be given an opportunity to further explain and clarify your answers when being questioned by the lawyers.  If you do not understand a question, please so indicate on your questionnaire.

Questionnaire, page 1.  The jurors were required to sign the questionnaires under penalty of perjury.  *See* Questionnaire, p. 13.

---

4.  The court did not give a citation for *Wright*, and we can find no such case on point.  It appears the court was referring to *People v. Price*, 1 Cal.4th 324 (1991), discussed below, which is directly on point.

Memorandum of Ps and As in Support of Answer, *Vasquez v. Felker*, - C 07-4250 WHA (PR)

5

1    From May 1 to May 16, 2002, the court assembled the prospective jurors in 20 separate

2    pools and explained to them the jury selection process. *See* RT 2327-2958. In each case, the court

3    read the information aloud and distributed the questionnaire to the jurors. The court also explained

4    to the jurors some of the more important questions, including Question 10. As an example, the court

5    said to the first pool:

6        [W]e're asking you things that are important, like have you, any family members or close
         friends ever been accused of or arrested or charged with or convicted of any crime. That
7        includes driving under the influence of alcohol, so if that pertains to you, please put it
         down.

8

9    RT 2344. The court made similar (and frequently more emphatic) comments to each of the other

10   pools. *See* RT 2370, 2404, 2430, 2462-2463, 2489, 2521, 2547, 2578, 2606, 2643, 2673, 2718,

11   2751, 2783, 2813, 2849, 2882, 2915, 2944.

12   During the subsequent voir dire, 15 jurors were identified (either by the prosecutor or the

13   court) as having been arrested for or convicted of a crime that was not disclosed on the juror's

14   questionnaire. Eleven of those jurors, including eight blacks, were dismissed on the prosecutor's

15   motion for cause. *See* RT 4398-4409, 4554-4559, 4590-4591, 4647-4648, 5342-5344, 6626-6627,

16   6901-6902, 7764-7765, 7781-7783, 7798, 7828-7829, 8244-8247, 8443-8444, 8577-8578, 8621-

17   8622. Petitioner now contend those dismissals were improper.[5]

18   **B.    A Juror Who Provides False Information During Voir Dire May Be Dismissed For
           Cause**

19

20   Petitioner asserts a number of reasons to support his argument that the trial court erred in

21   dismissing jurors who failed to disclose their criminal backgrounds. First, petitioner notes that

22   although the California Constitution expressly prohibits convicted felons from serving on juries,

23   there is no such prohibition for misdemeanants or arrestees. *See* Cal. Const., art. VII, § 8. Second,

24   _____

25   5. The dismissals are summarized in petitioner's opening brief on appeal (Exhibit 4) at pages
     15-22. As petitioner notes (Exh. 4 at 22, n. 21), the trial court denied one of the prosecutor's
26   challenges for cause because the prosecutor had not disclosed the juror's prior criminal background
     to the defense. *See* RT 4554-4559 for juror Rosenberg. Two other challenges were denied on the
27   grounds of mistaken identity. *See* RT 4384-4387, 4398-4399, 8286-8287 for jurors Massey and
     Quiroz. The court dismissed Ms. Nethercott on its own motion because she had suffered a prior
28   felony conviction. *See* RT 7764-7765, Court Exhibit XI.

1    California's statutory framework for jury selection lists several grounds for challenging jurors for

2    cause, but that list does not specifically include providing false information on voir dire. *See* Cal.

3    Code Civ. Proc., §§ 225-229. Third, petitioner speculates that some jurors may have omitted from

4    their questionnaires information about their criminal backgrounds because: (1) they had been

5    accused of crimes but not convicted, (2) their crimes were relatively insignificant or committed in

6    the distant past, or (3) some convictions ultimately might have been expunged from a juror's record.

7    For all these reasons, petitioner argues that the dismissals of these jurors for cause violated due

8    process.

9         The argument fails for several reasons. First, the violation of California statutes, or even

10   the California Constitution, does not give rise to a claim on federal habeas corpus. *See* 28 U.S.C.

11   § 2254(d) (habeas relief must be based on a violation of clearly established federal law).

12        Second, the jurors in question were not dismissed because they had been accused or

13   convicted of misdemeanors (or other crimes less serious than a felony), but because they had failed

14   to *disclose* such accusations or convictions. The seriousness of such a failure has been repeatedly

15   noted by the United States Supreme Court:

16        Voir dire examination serves to protect [a criminal defendant's right to a fair trial] by
          exposing possible biases, both known and unknown, on the part of potential jurors.
17        Demonstrated bias in the responses to questions on voir dire may result in a juror's being
          excused for cause; hints of bias not sufficient to warrant challenge for cause may assist
18        parties in exercising their peremptory challenges. The necessity of truthful answers by
          prospective jurors if this process is to serve its purpose is obvious.
19

20   *McDonough Power Equipment, Inc. v. Greenwood*, 464 U.S. 548, 554 (1984).

21        In determining a juror's impartiality during voir dire, "the Constitution lays down no

22   particular tests and procedure is not chained to any ancient and artificial formula." *United States v.*

23   *Wood*, 299 U.S. 123, 145-146 (1936). "[I]n each case a broad discretion and duty reside in the court

24   to see that the jury as finally selected is subject to no solid basis of objection on the score of

25   impartiality . . . ." *Frazier v. United States*, 335 U.S. 497, 511 (1948). "Accordingly, the presiding

26   trial judge has the authority and responsibility, either sua sponte or upon counsel's motion, to dismiss

27   jurors for cause." *U. S. v. Torres*, 128 F.3d 38, 43 (2d Cir. 1997).

28        Knowledge of a juror's prior contacts with law enforcement is obviously crucial to a

Memorandum of Ps and As in Support of Answer, *Vasquez v. Felker*, - C 07-4250 WHA (PR)

1  prosecutor in a criminal case. A person accused of a crime, much less arrested or convicted, will

2  likely harbor animus toward the criminal justice system. Thus, a juror who fails to disclose such

3  information in California "undermines the jury selection process and commits misconduct," even

4  if the failure is unintentional. *In re Hitchings*, 6 Cal.4th 97, 111-112 (1993). The California

5  Supreme Court has repeatedly held that a juror's failure to disclose his criminal background justifies

6  a dismissal for cause. Critically, the Court has allowed such dismissals in the middle of trial, and

7  even where the failure to disclose was inadvertent or arguably insignificant. *See*, e.g., *People v.*

8  *Johnson*, 6 Cal.4th 1, 22 (1993) ("[c]oncealment of prior criminal charges constitutes good cause

9  for discharge of a juror"); *People v. Price*, 1 Cal.4th at 400, n. 8 (a juror who failed to disclose a

10  prior conviction, even though he had later been pardoned, was properly dismissed for cause); *People*

11  *v. Morris*, 53 Cal.3d 152, 183 (1991).

12  Federal courts have held similarly. In *U.S. v. Blackman*, 66 F.3d 1572, 1575, n. 3 (11th

13  Cir. 1995), the trial court dismissed for cause a juror who had refused to fill out a questionnaire and

14  whose husband had a criminal record. The Court of Appeals affirmed, emphasizing that "[t]he

15  decision to exclude a juror for cause is within the sound discretion of the trial judge." *See also U.S.*

16  *v. Annigoni*, 96 F.3d 1132, 1139 (9th Cir. 1996) (en banc) (the trial court is in the best position to

17  make judgments concerning the impartiality and credibility of prospective jurors, and is therefore

18  given "considerable control over the scope of questioning permitted during voir dire"). "In criminal

19  cases, doubts about the existence of bias should be resolved against permitting the juror to serve."

20  *U.S. v. Buckhalter*, 986 F.2d 875, 879 (5th Cir. 1993) (upholding the trial court's dismissal of a

21  sitting juror for his failure to disclose a prior arrest).

22  In short, the trial court strictly warned the jurors at the outset of voir dire that they would

23  be disqualified from serving if they failed to fully disclose their criminal backgrounds on their

24  questionnaires. Because some jurors disregarded that warning, the court had ample discretion to

25  discharge them for cause.

26  **C.  The Improper Dismissal Of Jurors For Cause Does Not Require Reversal Of Petitioner's Conviction**

27

28  Even if the trial court had erred in dismissing jurors for failing to reveal their criminal

1  backgrounds during voir dire, petitioner would not be entitled to relief. In California a defendant

2  may not complain about "the even-handed application of a neutral criterion" to dismiss jurors for

3  cause during voir dire. *See People v. Howard*, 1 Cal.4th 1132, 1160 (1992). Moreover, "[t]he

4  general rule is that an erroneous exclusion of a juror for cause provides no basis for overturning a

5  judgment." *People v. Holt*, 15 Cal.4th 619, 656 (1997), quoting *Fein v. Permanente Medical Group*,

6  38 Cal.3d 137, 148 (1985); *see also People v. Morris, supra*, 53 Cal.3d at p. 183 ("The qualification

7  of a juror challenged for cause is a matter within the discretion of the trial court and is seldom a

8  ground for reversal on appeal"). As the Court of Appeal noted below, "'Since a defendant or a party

9  is not entitled to a jury composed of any particular jurors, the court may of its own motion discharge

10  a qualified juror without committing any error, provided there is finally selected a jury composed

11  of qualified and competent persons.'" *See* Court of Appeal Opinion (hereafter "Opn.") at 19, quoting

12  *Fein*, 38 Cal.3d at 148, and *Dragovich v. Slosson*, 110 Cal.App.2d 370, 371 (1952).

13         Federal courts have held similarly. In *United States v. Calhoun*, 542 F.2d 1094 (9th Cir.

14  1976), the defendant argued on appeal that the trial court had improperly dismissed two jurors on

15  its own motion during voir dire. The Ninth Circuit found no abuse of discretion, and further stated

16  that it would "not be inclined to reverse," even if there had been error. *Id.* at 1103. "A defendant

17  is entitled to an array of impartial jurors to whom he may direct his peremptory challenges, but,

18  having been provided with such a panel, he suffers no prejudice if a juror, even without sufficient

19  cause, is excused by the court." *Id.; see also U.S. v. Joseph*, 892 F.2d 118, 124 (D.C. Cir. 1989) ("A

20  defendant has no constitutional or other right to the service of a particular juror," so the improper

21  exclusion of a juror during voir dire "does not suggest any lack of impartiality on the part of those

22  jurors in fact serving").

23         In this case, petitioner accepted the jury as constituted without exhausting his peremptory

24  challenges. *See* RT 8958-8959. As a result, it must be presumed that he considered all empaneled

25  jurors qualified and competent. Thus, even if the trial court had erred in dismissing some

26  prospective jurors for cause, there is no basis for habeas relief.

27

28

## II.

**THE TRIAL COURT WAS NOT REQUIRED TO QUESTION THE JURORS ABOUT THEIR CRIMINAL BACKGROUNDS BEFORE DISMISSING THEM FOR CAUSE**

Petitioner continues his previous argument by contending the trial court was required, pursuant to *People v. Stewart*, 33 Cal.4th 425 (2004), to personally question the jurors before dismissing them for failing to disclose their criminal backgrounds.  Petitioner contends such questioning was necessary to determine whether the jurors' incomplete questionnaire responses resulted from mendacity or from a more innocent explanation, like forgetfulness or inattentiveness.

Again, the failure of a state court to follow state law procedures in conducting voir dire does not give rise to a federal constitutional violation. *See* 28 U.S.C. § 2254(d).

Moreover, as we have shown in the previous argument, a trial court in California may dismiss prospective jurors during voir dire on the basis of *any* neutral criterion, and a juror's failure to disclose his criminal background is both neutral and reasonable.

*Stewart* does not hold to the contrary.  There, prospective jurors in a capital case were given a questionnaire which asked, inter alia, whether the jurors held opinions or beliefs which would "prevent or make it very difficult" for them to vote for the death penalty. 33 Cal.4th at p. 442-443.  Five jurors checked "yes" next to this question, and the trial court summarily dismissed them without individualized voir dire. *Id.* at pp. 444-445.

The California Supreme Court found the dismissals improper.  The Court noted that a juror's views on the death penalty are disqualifying only if they would "prevent or substantially impair" the performance of the juror's duties, as defined by the court's instructions and the juror's oath. 33 Cal.4th at p. 446, citing *Wainwright v. Witt*, 469 U.S. 412, 424 (1985).  The Supreme Court believed the jurors' questionnaire answers did not reveal a categorical reason for disqualification because people "who firmly believe that the death penalty is unjust may nevertheless serve as jurors in capital cases so long as they clearly state that they are willing to temporarily set aside their own beliefs in deference to the rule of law." 33 Cal.4th at p. 446, citing *Lockhart v. McCree*, 476 U.S. 162, 176 (1986).  As a result, the trial court should not have dismissed the jurors without questioning them individually.  The Supreme Court also noted, however, that when prospective jurors are

1    dismissed from a jury pool in violation of *Wainwright v. Witt*, the death penalty must be set aside,

2    but not the underlying conviction. 33 Cal.4th at p. 455; *see also People v. Heard*, 31 Cal.4th 946,

3    972-982 (2003) (reversing penalty phase judgment for erroneous exclusion of prospective juror for

4    cause, but affirming guilt judgment and special circumstance findings); *People v. Ashmus*, 54 Cal.3d

5    932, 956-957 (1991) (same).

6         *Stewart* is inapposite here for two reasons. First, it is undisputed that each of the

7    challenged jurors in this case failed to disclose criminal accusations, arrests, or convictions. Thus,

8    the dismissals were proper, unlike in *Stewart*. More important, the dismissals here did not relate to

9    the jurors' opinions about the death penalty. Thus, even if there had been error, it would have

10    justified reversal only of a death sentence. Because petitioner was not sentenced to death, any error

11    in dismissing jurors for cause was meaningless.

12         Petitioner also contends the trial court's dismissals of the jurors in question constituted an

13    improper "blanket exclusion of a class of prospective jurors," and therefore denied him a jury

14    representing a fair cross section of the community. Petitioner likens the situation presented here to

15    that of: (1) *Abbott v. Mines*, 411 F.2d 353 (6th Cir. 1969), a medical malpractice case in which all

16    women were excluded from the jury panel, without inquiry, because it was asserted that evidence

17    relating to cancer of a man's genitals would be "distasteful" to women, and (2) *People v. Johnson*,

18    22 Cal.3d 296 (1978), where the prosecutor challenged all black jurors on the presumption that none

19    could objectively assess the credibility of certain prosecution witnesses.

20         As noted above, a defendant is not denied due process where the trial court applies a

21    legitimate, neutral criterion to exclude a class of jurors. Of course, the exclusion of an entire class

22    of jurors on the basis of an "immutable characteristic" like race, gender, or ethnic background is

23    improper. *See Lockhart v. McCree, supra*, 476 U.S. at p. 175. The exclusion of jurors who provide

24    false information to the court, in contrast, is entirely appropriate. For the reasons stated in Argument

25    I above, there was no error.

26

27

28

1

**III.**

2    **THE PROSECUTOR'S CHALLENGES FOR CAUSE WERE NOT RACIALLY DISCRIMINATORY**

3

4    Petitioner further contends the dismissal of jurors who failed to disclose their criminal

5    backgrounds violated equal protection because those dismissals had a disproportionate impact on

6    blacks. Noting that eight of the 15 jurors challenged for cause were black, petitioner argues that the

7    prosecutor's dismissal of these jurors was comparable to an unconstitutional denial of the right to

8    vote on the basis of race.

9    The argument is contrary to both common sense and the record. As shown above, it was

10    the trial court, not the prosecutor, who insisted at the outset of voir dire that jurors who did not fully

11    disclose their criminal backgrounds would be dismissed for cause. Such a policy was neutral and

12    reasonable, and the prosecutor had no reason to restrict it to black jurors. Again, a juror who has a

13    criminal background is likely to be hostile to law enforcement, and a juror who fails to disclose such

14    a background is either dishonest or careless. No prosecutor would want such a juror—regardless of

15    race—to hear a capital case.

16    In any event, the prosecutor disclosed during discovery the arrest records of 14 prospective

17    jurors who did not report their criminal backgrounds on their questionnaires. Half of those people

18    were not black, and all were discharged (other than the two cases of mistaken identity).

19    Significantly, many of those prospective jurors favored the death penalty (and in some cases, favored

20    it strongly). *See, e.g.*, Questionnaires (p. 11) of Nethercott, Markham, Chappell, Quiroz, Bryant,

21    Woll, and Lee. On this record, the Court of Appeal reasonably found no evidence of racial

22    discrimination. Opn. at 19.

23

**IV.**

24    **THE TRIAL COURT PROPERLY EVALUATED AND DENIED PETITIONER'S *BATSON/WHEELER* MOTIONS**

25

26    Petitioner contends his conviction should be set aside because the prosecutor exercised

27    impermissible peremptory challenges to a number of prospective jurors during voir dire. The trial

28    court found the prosecutor's peremptory challenges valid, and the Courts of Appeal agreed. Those

1  findings should be respected here.

2  **A.  *Batson/Wheeler* Motions**

3        Purposeful racial discrimination in the selection of a jury violates equal protection because

4  it denies a defendant the protection that a trial by jury is intended to secure. *Batson v. Kentucky,* 476

5  U.S. 79, 84-89 (1986).  When a defendant in California believes a prosecutor is improperly using

6  peremptory challenges to strike potential jurors on the basis of race, he may challenge the practice

7  pursuant to *Batson* and *People v. Wheeler,* 22 Cal.3d. 258, 276-77 (1978).

8        In *Batson,* the Supreme Court established a three-part test for determining whether a

9  prosecutor's use of peremptory challenges to exclude prospective jurors violates equal protection.

10 First, a defendant must make a prima facie showing that a peremptory challenge has been exercised

11 on the basis of race.  Second, if that showing has been made, the prosecution must offer a

12 race-neutral basis for striking the juror in question.  Third, in light of the parties' submissions, the

13 trial court must determine whether the defendant has shown purposeful discrimination. *Miller-El*

14 *v. Cockrell,* 537 U.S. 322, 328-29 (2003), citing *Batson,* 476 U.S. at 96-98.[6]

15        "[A] state court's finding of the absence of discriminatory intent is 'a pure issue of fact'

16 accorded significant deference." *Miller-El,* 537 U.S. at 339, *quoting Hernandez,* 500 U.S. at 364;

17 *see also Hernandez,* 500 U.S. at 367 (discrimination in challenging potential jurors "is, as *Batson*

18 recognized, a question of historical fact").  AEDPA embraces this deference in two provisions: (1)

19 a federal court may not grant habeas relief unless it finds a state-court conclusion "an unreasonable

20

---

21        6.  For many years, the standards for determining whether a prima facie case had been
22 established were phrased differently under *Wheeler* and *Batson.*  Under *Wheeler,* the moving party
   was required to show that it was "more likely than not" that a party was exercising improper
23 challenges, while the moving party under *Batson* was required to "raise an inference" that a juror was
   improperly excluded. The United States Supreme Court held in *Johnson v. California,* 545 U.S. 162,
24 168 (2005), that the proper standard was the *Batson* "inference" standard. However, a federal habeas
   court need not dwell on the first step of the *Batson* analysis if the matter has proceeded to the second
25 or third step.  "Once a prosecutor has offered a race-neutral explanation for the peremptory
26 challenges and the trial court has ruled on the ultimate question of intentional discrimination, the
   preliminary issue of whether the defendant has made a prima facie showing becomes moot."
27 *Hernandez v. New York,* 500 U.S. 352, 359 (1991).

28

1  determination of the facts in light of the evidence presented in the State court proceeding" (28 U.S.C.

2  § 2254(d)(2)), and (2) state-court factual findings are presumed correct, and the petitioner has the

3  burden of rebutting the presumption by "clear and convincing evidence" (28 U.S.C. § 2245(e)(1)).

4  *See Rice v. Collins*, 546 U.S. 333, 338-339 (2006).  The Supreme Court has not yet decided which

5  of these two provisions governs a case like this.  *See id.*  At a minimum, a federal habeas court can

6  only grant relief if a trial court's factual findings on a *Batson/Wheeler* motion were unreasonable.

7  *See id.* at 342 ("the only question is whether the trial court's factual determination at *Batson's* third

8  step was unreasonable").

9         For many years, the California Supreme Court disapproved of performing a comparative

10  juror analysis for the first time on appeal.  *See* Opn. at 6, citing *People v. Johnson*, 47 Cal.3d 1194,

11  1221 (1989).  The California Supreme Court recently acknowledged, however, that its ruling in

12  *Johnson* has been called into question by the United States Supreme Court's decision in *Miller-El*

13  *v. Dretke*, 545 U.S. 231 (2005).  *See People v. Schmeck*, 37 Cal.4th 240, 270 (2005).  The *Miller-El*

14  court observed that if a prosecutor's explanation for a peremptory challenge "applies just as well to

15  an otherwise-similar nonblack [juror] who is permitted to serve, that is evidence tending to prove

16  purposeful discrimination." 545 U.S. at 241.  As a result, comparative analysis may now be required

17  for the first time on appeal.

18         The Ninth Circuit has occasionally used comparative analysis to evaluate *Batson* claims

19  on appeal.  For the most part, the Ninth Circuit has recognized that a trial court's evaluation of a

20  prosecutor's peremptory challenges is entitled to great deference, given that jury selection is such

21  a fluid and subjective process.  *See, e.g., Burks v. Borg*, 27 F.3d 1424, 1429  (9th Cir. 1994) (a

22  prosecutor may rely on subjective factors and "reevaluate the weight he gives to various

23  characteristics as he begins to exhaust his peremptories"; the evaluation of the prosecutor's good

24  faith is "peculiarly within a trial judge's province").  The Ninth Circuit has used comparative

25  analysis to set aside convictions on *Batson* grounds, but only in rare cases, where the prosecutor's

26  reasons for a peremptory challenge were *affirmatively refuted* by the record.  *See, e.g., United States*

27  *v. Chinchilla*, 874 F.2d 695, 698-698 (9th Cir. 1989) (two of the three explanations offered by a

28  prosecutor for dismissing Hispanic jurors "were objectively and demonstrably false," and the

1  remaining reason was not sufficiently clear and specific to justify dismissal); *Turner v. Marshall*, 121

2  F.3d 1248, 1254 (9th Cir. 1997) (the prosecutor challenged a black man, merely because he was

3  reluctant to view crime scene photos, while an even more reluctant white juror was not challenged).

4  The *Turner* court emphasized that its holding was limited to its exceptional facts, and that *Batson*

5  is not violated merely when prospective jurors of different races provide similar responses and one

6  is excused while the other is not. *Id.*

7  **B.    The State Court Proceedings**

8          Petitioner and his codefendants made three joint *Wheeler* motions during the jury selection

9  process, each time arguing that the prosecutor had exercised discriminatory peremptory challenges

10 against prospective black jurors. In each instance, the trial court found that petitioner had established

11 a prima facie case of discrimination and asked the prosecutor for an explanation. *See* RT 8928-8929,

12 8944, 8948, 8970. The prosecutor offered multiple reasons for excusing nearly every juror. At the

13 conclusion of each hearing, the trial court stated that the prosecutor's reasons were valid, racially

14 neutral, and justified by the record. *See* RT 8932, 8933-8934, 8935, 8948, 8977-8978. The final jury

15 panel included two blacks, Juror No. 4 and Alternate Juror No. 5. RT 8928, 8978.

16         On direct appeal, petitioner argued that some of the prosecutor's reasons for his challenges

17 were implausible, pretextual, and unsupported or contradicted by the record. Petitioner also argued

18 that comparative juror analysis demonstrated that the prosecutor had examined black jurors

19 differently than other jurors, and that his explanations were pretextual.

20         In light of *Miller-El* and *People v. Schmeck*, discussed above, the Court of Appeal

21 assumed that a comparative analysis may now be required for the first time on appeal. Opn. at 6.

22 After applying such an analysis in this case, the Court of Appeal found no evidence of purposeful

23 discrimination. Opn. at 6-17.[7/]

24

25     7. In affirming the trial court's denials of the *Wheeler* motions, the Court of Appeal generally
       did not evaluate all of the prosecutor's reasons, but focused instead on the most compelling reasons.
26     The Court of Appeal's failure to evaluate each of the prosecutor's reasons does not mean that those
       reasons may not be considered on federal habeas corpus. *See Rice v. Collins*, 546 U.S. at 340-342
27     (even though the prosecutor mentioned an improper characteristic (gender) in dismissing a juror, his
       remaining reasons were valid; thus, "the only question, . . . [was] whether the trial court's factual
28     determination of non-discrimination was unreasonable).

Memorandum of Ps and As in Support of Answer, *Vasquez v. Felker*, - C 07-4250 WHA (PR)

**C.   Each Of The Prosecutor's Peremptory Challenges Was Supported By Multiple Race-Neutral Reasons**

The prosecutor provided race-neutral reasons for each of his peremptory challenges.

**Mr. Jackson**

The prosecutor's primary reason for dismissing Mr. Jackson was that he had expressed "real reservations" about the death penalty. RT 4224. The prosecutor observed that Mr. Jackson's home, Berkeley, is "a hotbed of anti-death-penalty people" (RT 8929), and that Mr. Jackson had specifically acknowledged that he would not consider the death penalty "an easy sell" (RT 4225). Mr. Jackson also said the prosecutor would "lose the case" if he did not resolve "all" of Mr. Jackson's "reservations and apprehensions" about the death penalty. *See* RT 4239-4242.

Mr. Jackson's reservations about the death penalty were obviously important to the prosecutor in this capital case, given that two of the defendants had not personally killed the victim. As an apparent result, the prosecutor routinely challenged prospective jurors, regardless of race or any other characteristic, who had expressed doubts about the death penalty. *See, e.g.*, 3985, 3996, 4500, 4546, 4688, 5338-5339, 5502, 5659, 5782, 5790-5793, 6039-6042, 7154, 7534-7540, 7586, 7716, 8373-8379, 8623. Such challenges were not racially discriminatory. *See Wainwright v. Witt*, 469 U.S. 412, 424 (1985) (a challenge for cause may be exercised against a juror whose views on the death penalty would "prevent or substantially impair" the performance of his duties; otherwise, the prosecutor must exercise a peremptory challenge to such a juror); *Boyde v. Brown*, 404 F.3d 1159, 1170 (9th Cir. 2005) (a juror's "hesitation" over the death penalty was "plainly" race-neutral); *Matthews v. Evatt*, 105 F.3d 907, 917-918 (4th Cir. 1997) (reservations about the death penalty are a valid reason for a peremptory challenge); *Pitsonbarger v. Gramley*, 141 F.3d 728, 735 (7th Cir. 1998) (same).

Mr. Jackson also wondered whether "poor people get the same kind of representation that rich people get" (RT 4239), and he cautioned the prosecutor that he would scrutinize the relative performances of the attorneys to ensure that the trial was "a fair fight" (RT 4240-4241). *See Tolbert v. Gomez*, 190 F.3d 985, 989 (9th Cir. 1999) (a juror's expressed concern about the fairness of the justice system justified a peremptory challenge).

1    Finally, the prosecutor also dismissed Mr. Jackson because there were "much better jurors

2 waiting in the wings to replace him." RT 8929. That reason was permissible. *See People v.*

3 *Alvarez*, 14 Cal.4th 155, 194-195, 197-198 (1996) (upholding a peremptory challenge because the

4 prosecutor had noted that, at the time of the strike, "there were more favorable prospective jurors

5 about to be called into the jury box").

6    Petitioner correctly notes that the prosecutor twice mis-cited the record in explaining his

7 dismissal of Mr. Jackson. First, the prosecutor mistakenly attributed to Mr. Jackson comments

8 actually made by Ms. Jasper (e.g., "I don't know if I could live with thinking I basically killed this

9 person"; and "I don't know if I can consciously end someone's life"). *Compare* RT 4232-4234 with

10 Jasper Quest. at 11-12. Second, the prosecutor said that Mr. Jackson had "indicated in his

11 questionnaire that he has problems with the system with respect to the fairness of the death penalty"

12 (RT 8929), when no such verbatim statement appears in Mr. Jackson's questionnaire.

13    Preliminarily, it is undisputed that Mr. Jackson expressed more than one reason for his

14 reservations about the death penalty. He was not only concerned about the fairness of the criminal

15 justice system, he also said he would be unlikely to impose death if the prosecutor appeared more

16 capable than the defense attorney(s). As a result, the prosecutor could reasonably say that Mr.

17 Jackson had "problems with the system with respect to the fairness of the death penalty," even if Mr.

18 Jackson did not use those exact words to characterize his attitude. It is similarly irrelevant that the

19 prosecutor mistakenly attributed to Mr. Jackson comments actually made by Ms. Jasper. Again, Ms.

20 Jasper's words, "I don't know if I can consciously end someone's life," fairly characterized Mr.

21 Jackson's attitude. In any event, a mistaken reason for a peremptory challenge is not necessarily

22 invalid, so long as the mistake is honestly made. *See People v. Silva*, 25 Cal.4th 345, 385 (2001) (a

23 prosecutor's isolated mistaken dismissal of a juror is not enough to demonstrate discriminatory

24 intent); *People v. Williams*, 16 Cal.4th 153, 188-189 (1997) ("a genuine 'mistake' is a race-neutral

25 reason" for a peremptory challenge).

26    Petitioner also contends the dismissal of Mr. Jackson was pretextual because he seemed

27 to possess many "pro-prosecution" characteristics. For example, Mr. Jackson owned a pistol and

28 was a retired trucker (which petitioner describes as "not a traditionally liberal profession" (Exh. 5

Memorandum of Ps and As in Support of Answer, *Vasquez v. Felker*, - C 07-4250 WHA (PR)

17

1    at 60)).    Preliminarily, the Ninth Circuit has expressed skepticism over such after-the-fact

2    evaluations.    *See, e.g.*, *McClain v. Prunty*, 217 F.3d 1209, 1223 (9th Cir. 2000) ("We doubt our

3    ability, or the ability of the parties, always to assess accurately whether a juror will be sympathetic

4    to a particular side").    More important, a juror who expresses skepticism over the death penalty, even

5    if "pro prosecution" in other respects, will rarely be attractive to a prosecutor in a capital case.

6              Petitioner also argues that the prosecutor's concern about Mr. Jackson's home in Berkeley

7    was insincere because the prosecutor did not also challenge Juror No. 6, who had graduated from

8    UC-Berkeley, which petitioner characterizes as "the real 'hotbed' of liberal thought." Exh. 5 at 61.

9    In fact, Juror No. 6 differed from Mr. Jackson in many important ways.    She was a 38-year-old

10   woman who lived with her husband and five-year-old child in Castro Valley.    Supplemental Clerk's

11   Transcript ("SCT") 77.    She had studied mechanical engineering at UC-Berkeley, and she had

12   worked for an engineering firm for more than 15 years.    SCT 80.    She favored the death penalty,

13   without any apparent qualification, because she believed "[t]he option must be available for those

14   crimes that warrant it." SCT 87.    It cannot be said that a single shared characteristic—residence in

15   Berkeley—required the prosecutor to treat Juror No. 6 and Mr. Jackson identically.    *See, e.g.*,

16   *Matthews v. Evatt*, 105 F.3d at 918 (differing characteristics of dismissed and non-dismissed jurors,

17   including the intensity of their feelings about the death penalty, allowed the prosecutor to treat them

18   differently); *Murphy v. Dretke*, 416 F.3d 427, 434, 435 (5th Cir. 2005); *U.S. v. Jimenez*, 77 F.3d 95,

19   100-101 (5th Cir. 1995).

20            Finally, petitioner argues that the dismissal of Mr. Jackson was pretextual because eight

21   of the empaneled jurors (and alternates) expressed reservations about the death penalty similar to Mr.

22   Jackson's.    *See* Exh. 5 at 62.[8/]    In fact, the isolated comments of five of the non-dismissed jurors

23   quoted by petitioner reflect *support* for the death penalty, not opposition to it.    For example, when

24   those jurors were asked whether they could impose the death penalty, they responded as follows:

25   "Under certain circumstances, I believe I could" (No. 1, RT 6050); "I believe so, yes" (No. 11, RT

26   6749); "I believe I can" (No. 12, RT 4758); "I think I probably could, depending on the

27

28         8.  Petitioner quotes nine jurors, but it appears that one comment was attributed to two
     different jurors, No. 5 and No. 8.  *See* Exh. 5 62, quoting RT 8296 for both jurors.

1  circumstances" (Alternate No. 1, RT 5592); "I think so" (Alternate No. 2, RT 6416). *See* Exh. 5 at

2  62. Three of the jurors quoted by petitioner appeared to hesitate over the court's initial question

3  about the death penalty: No. 2 said, "I've never been in that situation" (RT 5121); No. 5 said, "I

4  don't know, honestly" (RT 8296); No. 9 said, "Possibly if—depending on the circumstances" (RT

5  3863). Upon further questioning, however, each of these jurors expressed an unqualified ability to

6  impose the death penalty, if warranted by the circumstances. *See* RT 5121-5137 (No. 2); RT 8297-

7  8317 (No. 5); RT 3863-3875 (No. 9). As a result, it cannot be said that the prosecutor applied a

8  different standard to Mr. Jackson than to the empaneled jurors.

9  **Mr. Norman**

10  The prosecutor dismissed Mr. Norman because he wrote on his questionnaire that he was

11  "not exactly for" the death penalty. RT 8777. Although Mr. Norman insisted he could impose the

12  punishment, he repeatedly indicated that he disfavored it, saying things like, "For the most part, I'm

13  against the death penalty," and "I never saw myself doing it." RT 8777, 8790. He also said he was

14  "more inclined to maybe think of life without parole before the death penalty" for any defendant who

15  did not personally kill the victim. RT 8785. Again, that comment was particularly significant here,

16  given that only one of the three defendants had actually shot Deputy Monego.

17  When the prosecutor asked Mr. Norman why he was opposed to the death penalty, he said,

18  "Well, I'm a Christian and I attend church on a regular basis, and so actually I worked at Juvenile

19  Hall with youngsters and I do know that over time that people change. And I recognize that." RT

20  8790. Contrary to petitioner's assertions (Exh. 5 at 65), such statements supported the prosecutor's

21  assertion that Mr. Norman appeared to hold religious and philosophical qualms about the death

22  penalty. *See* RT 8933. Thus, the challenge was proper. *See J.E.B. v. Alabama ex rel. T.B.* (1994)

23  511 U.S. 127 (the federal Constitution does not prohibit a prosecutor from excluding a juror on the

24  basis of his religious beliefs); *see also Davis v. Minnesota* (1994) 511 U.S. 1115 (dis. opn. of

25  Thomas, J.) (arguing that certiorari should be granted where a prosecutor exercised a peremptory

26  challenge to an African-American juror because he was a Jehovah's Witness); *U.S. v. Smith*, 223

27  F.3d 554, 569 (7th Cir. 2000) ("social worker type" was properly challenged because she might be

28  too sympathetic to the defendant).

1    In any event, both the prosecutor and the trial court noted that Mr. Norman had been absent

2  or late on two occasions during voir dire. *See* RT 8933.  Such a cavalier attitude toward the

3  proceedings amply justified his dismissal. *See, e.g.*, *U.S. v. Lorenzo*, 995 F.2d 1448, 1454 (9th Cir.

4  1993) (inattentiveness a is race-neutral criterion for dismissal); *U.S. v. Changco*, 1 F.3d 837, 840 (9th

5  Cir. 1993) (passivity, inattentiveness, and inability to relate to other jurors are neutral criteria).

6  **Ms. Jasper**

7    The prosecutor dismissed Ms. Jasper because she stated on her questionnaire that she was

8  "moderately against" the death penalty, specifically writing, "I don't know if I can consciously end

9  someone's life." Jasper Quest. at 11-12. She also wrote that although she was "impartial" about the

10  death penalty, she had "mixed feelings on whether or not killing someone is the right thing to do."

11  *Id*. at 11.  When asked about this comment she stated, "Well, I don't know if I could live with

12  thinking I've basically killed this person.  That's pretty tough."  RT 4095.  She also wondered

13  whether she "could possibly know" that a defendant was "a hundred percent" guilty. RT 4095-4096.

14  Those comments clearly justified the prosecutor's concern that Ms. Jasper was "morally against" the

15  death penalty.  RT 8934-8935.

16    Ms. Jasper also wrote on her questionnaire that the criminal justice system is biased against

17  "those who do not have enough money to pay for a decent lawyer." Jasper Quest. at 7.  She similarly

18  stated on voir dire,"I think a lot of people get the runaround. . . . [T]hose who have enough money

19  to pay for a nice lawyer get the best defense possible." RT 4100.  Although petitioner believes these

20  opinions are "not very remarkable" (Exh. 5 67), they certainly justified her dismissal. *See Tolbert*

21  *v. Gomez*, 190 F.3d at 989.

22    The prosecutor also noted that Ms. Jasper was a single mother who had come to court

23  wearing leather pants. Either reason justified dismissal. *See U.S. v. Cobb*, 185 F.3d 1193, 1196,

24  n. 2 (11th Cir. 1999) (prosecutor properly dismissed a single mother of three children on welfare

25  because her condition "reflected on her morality"); *see also Elem v. Purkett*, 64 F.3d 1195 (8th Cir.

26  1995) (juror's long hair justified dismissal); *Jordan v. Lefevre*, 293 F.3d 587, 595 (2d Cir. 2002)

27  (youth and maturity are race-neutral criteria).

28    The prosecutor also believed Ms. Jasper was "not friendly" to him.  Although petitioner

1  sees no basis for this opinion in the record, the trial court did not disagree.  As a result, it must be

2  presumed that something about Ms. Jasper—her posture or tone of voice—conveyed this impression.

3  *See Williams v. Rhoades*, 354 F.3d 1101, 1108 (9th Cir. 2004) (juror was properly dismissed because

4  she appeared friendly to the defense but "evasive" to the prosecutor).

5       Finally, the prosecutor was troubled by the fact that Ms. Jasper did not appear "interested

6  in pursuing her career." RT 8934.  At the outset of voir dire, Ms. Jasper indicated that her employer

7  had asked her to obtain a hardship excuse because her co-worker was going to be on maternity leave.

8  When asked whether a lengthy absence from her job would cause a hardship, Ms. Jasper stated, "[I]t

9  really doesn't matter for me." RT 4085-4086.  From this comment, the prosecutor concluded Ms.

10 Jasper was unambitious, and therefore unsuitable as a juror.  Of course, such a generalization may

11 have been debatable, but a peremptory challenge may be based on unsound generalizations, so long

12 as they are sincerely held.  *See Rice v. Collins*, 546 U.S. at 338 (a prosecutor's reason for a

13 peremptory challenge need "not be persuasive, or even plausible," so long as it is not "inherently

14 discriminatory"); *United States v. Steele*, 178 F.3d 1230, 1235 (11th Cir. 1999) ("[A] legitimate

15 reason is not a reason that makes sense, but a reason that does not deny equal protection").  Since

16 the trial court never questioned any of the prosecutor's reasons for his dismissals, they must be

17 presumed sincere.

18 **Mr. Webster**

19       In initially explaining the dismissal of Mr. Webster, the prosecutor said, "He obviously

20 didn't like me; he was very hostile and argumentative during the course of the questioning by me."

21 RT 8944-8945.  As petitioner notes, the transcript of the voir dire of Mr. Webster does not reflect

22 any hostility, and the prosecutor later appears to have acknowledged that he had confused Mr.

23 Webster with Mr. Massey.[9]

24       Notwithstanding the error, the prosecutor dismissed Mr. Webster primarily because of his

25 skepticism about the death penalty.  Mr. Webster wrote on his questionnaire that he would vote

26

27       9. At the outset of his explanation for the dismissal of Mr. Massey, the prosecutor said, "And
   Mr. Massey, he was the one that obviously didn't like me.  He was irritated at the questions I was
28 asking, wasn't answering them straight up, in my opinion." RT 8946.

1  against the death penalty because he had "read too many stories about people wrongly convicted."

2  Webster Quest. at 11; RT 6289.  Mr. Webster also hoped the death penalty would someday be

3  abolished because it is "uncivilized." Webster Quest. at 11; RT at 6279, 6288-6289. Although Mr.

4  Webster later said he was capable of imposing the death penalty "if the circumstances warranted"

5  (RT 6279), he added that he would find it "difficult" to vote to execute a non-killer (RT 6285-6286,

6  6293-6295).  Those ambivalent comments justified a peremptory challenge.

7          The prosecutor also challenged Mr. Webster because he had been treated by a therapist for

8  depression.  *See* Webster Quest. at 10.  Nothing in the record suggests this reason was false or

9  pretextual.  Thus, it must be presumed that the trial court found the prosecutor's overall reasons to

10  be valid.  *See Rice v. Collins*, 546 U.S. at 338 (a prosecutor's reason for a peremptory challenge need

11  "not be persuasive, or even plausible," so long as it is not "inherently discriminatory"); *United States*

12  *v. Steele*, 178 F.3d at 1235 ("[A] legitimate reason is not a reason that makes sense, but a reason that

13  does not deny equal protection").

14      **Mr. Massey**

15          Before any jurors were interviewed on the afternoon of July 22, 2002, the prosecutor

16  informed the court and the defense attorneys that prospective juror Keith Massey had failed to

17  disclose a lengthy criminal record. *See* RT 4382.  Two of the defense attorneys refused to stipulate

18  to the dismissal of Mr. Massey, so the court allowed him to be questioned. RT 4382. The court told

19  Mr. Massey that it appeared he had a four-page arrest record. RT 4384. Mr. Massey said he had

20  never been arrested.  Closer examination of the records revealed that they related to Mr. Massey's

21  twin brother, Kelly. RT 4385. Mr. Massey denied any knowledge of his brother's arrest record, so

22  the court declined to dismiss him for cause. RT 4386-4387. The prosecutor thereupon questioned

23  Mr. Massey about his knowledge of his brother's criminal record.  RT 4398-4400.

24          As noted in the footnote immediately above, the prosecutor's primary reason for ultimately

25  dismissing Mr. Massey was his hostile attitude.  The prosecutor commented that Mr. Massey had

26  become visibly irritated after the trial court inquired about his apparent rap sheet. *See* RT 8946.

27  Although the rap sheet related to Mr. Massey's twin brother, the prosecutor reasonably could have

28  feared that Mr. Massey might resent having been accused in court of being a criminal.  One of the

1   purposes of peremptory challenges is to allow attorneys to aggressively question potential jurors

2   without fear of alienating them. *See People v. Wheeler*, 22 Cal.3d at p. 275, n. 16 (a peremptory

3   challenge "allows a party to remove a juror whom he has offended by a probing voir dire or by an

4   unsuccessful challenge for cause, and thereby safeguards the vigorous exercise of both those rights").

5          The prosecutor also believed Mr. Massey had not been honest about his brother's

6   background. RT 8946-8947. Although the jury questionnaire asked about arrest records of jurors

7   and their friends and relatives, Mr. Massey did not indicate on his questionnaire *any* of Kelly's

8   arrests. Given that Kelly had a four-page arrest record, and that at least one of those arrests had

9   occurred while Mr. Massey was living with Kelly, it seems likely that Mr. Massey had intentionally

10  concealed Kelly's record. As the trial court stated, "You could . . . take the position that if he doesn't

11  know his brother's been arrested about 90 times, he's not exactly being level." RT 4447; *see also*

12  *Stubbs v. Gomez*, 189 F.3d 1099, 1105 (9th Cir. 1999) (dismissed juror perceived by prosecutor as

13  untruthful about a prior arrest).

14         The prosecutor also dismissed Mr. Massey because he was a postal worker, and therefore

15  possibly "lazy." RT 8947. The prosecutor further noted that Mr. Massey "didn't seem to

16  understand any of the questions" on voir dire. RT 8947. The record supports that claim. The court's

17  preliminary questioning of Mr. Massey proceeded as follows:

18     Q.   The question is, are you the type of person that could ever vote to execute another
            human being? Is that something you think you could do?
19
20     A.   I've never had to do it, but I've never really thought about that.

21     Q.   Could you do it?

22     A.   I'm not for or against, so far as is I know.

23     Q.   Forget about whether you're for or against.

24     A.   I know that if I had to do it, I could do it.

25     Q.   Okay. Well, let me tell you something, nobody's ever going to tell you have to do
            it in this case.

26     A.   If I had to figure it out with other people.

27     Q.   Okay. If you had a choice?

28     A.   If I had a choice.

1  Q.  You could do it?

2  A.  To vote on it.

3  Q.  Let's put it this way: If you felt somebody deserved the death penalty, could you see yourself voting for it?

4  A.  Yes.

5  RT 4388.

6      The subsequent questioning of Mr. Massey was protracted, particularly when the

7  prosecutor pressed Mr. Massey about the culpability and appropriate punishment for non-shooters.

8  *See* RT 4389-4408. The court repeatedly interjected questions to Mr. Massey during the prosecutor's

9  questioning, apparently to clarify his responses. *See* RT 4400, 4404, 4405, 4407. It is irrelevant that

10  Mr. Massey ultimately gave clear and succinct responses to some of the prosecutor's questions; the

11  questioning as a whole confirms that the prosecutor had great difficulty determining Mr. Massey's

12  positions on critical issues. Thus, the peremptory challenge was proper. *See Washington v. Johnson*,

13  90 F.3d 945, 954 (5th Cir. 1996) (dismissed juror appeared "obstinate").

14  **Mr. Thompson**

15      The prosecutor observed that Mr. Thompson was a Baptist minister who said at one point,

16  "I can't hold judgment on anyone." RT 7397. Mr. Thompson also found it "hard to say" whether

17  non-killers should be eligible for the death penalty. RT 7401. Thus, even if Mr. Thompson

18  ultimately stated that he could impose the death penalty, even for non-killers, the prosecutor had

19  ample reason to dismiss him. In addition, the prosecutor believed other prospective jurors, after Mr.

20  Thompson, were "much more pro-death-penalty." RT 8972. That reason also supported the

21  dismissal. *See People v. Alvarez*, 14 Cal.4th at 197-198 ("there were more favorable prospective

22  jurors about to be called into the jury box").

23  **Mr. Barnes**

24      Mr. Barnes never explicitly said that he had reservations about the death penalty, but his

25  overall responses to the voir dire questioning were, as the prosecutor noted, very abrupt. *See* RT

26  6390-6395. For example, when asked about his "philosophy" toward the death penalty, Mr. Barnes

27  said, "I don't have a philosophy. I know it exists." RT 6390. When asked a follow-up question

28

1   about the death penalty, Mr. Barnes replied, "I thought I answered that earlier . . . ." RT 6393.

2   When asked how he felt about the felony-murder rule, he replied, "I don't. . . . I know it exists. I

3   know it has to be applied. It can be applied." RT 6395. Thus, even though Mr. Barnes occasionally

4   answered some questions directly, the prosecutor could reasonably characterize Mr. Barnes as

5   "hostile," "unfriendly," and "closed." RT 8972. A juror who gives non-responsive answers during

6   voir dire may be peremptorily challenged. *See Washington v. Johnson*, 90 F.3d at 954 (juror

7   appeared obstinate).

8           The prosecutor surmised that Mr. Barnes was hostile because police officers had once held

9   a gun to his head, mistaking him for a robber. *See* RT 8972. Given that this case involved the

10  murder of an East Bay sheriff's deputy, the prosecutor understandably was uneasy about keeping Mr.

11  Barnes on the jury. *See Messiah v. Duncan*, 435 F.3d 186, 201 (2d Cir. 2006) (juror had suffered

12  prior conviction and had relatives in prison, so he might be unduly sympathetic to the defense).

13          The prosecutor also noted that Mr. Barnes had previously filed for bankruptcy, which

14  might indicate irresponsibility. RT 8973. *See U.S. v. Cobb*, 185 F.3d at 1196, n. 2 (a single mother

15  on welfare was dismissed because her condition "reflected on her morality"). Mr. Barnes also had

16  contributed to both the ACLU and Amnesty International. RT 8972-8973; Barnes Quest. at 5. As

17  a result, the prosecutor could reasonably suspect that Mr. Barnes might be "liberal," or sympathetic

18  to criminal defendants. Although petitioner questions that suspicion here, the prosecutor also

19  dismissed two non-black jurors who had contributed to either the ACLU or Amnesty International,

20  Mr. Shers and Mr. Wolfson, even though both men said they could impose the death penalty. *See*

21  RT 3984, 3998-3999, 5326, 8957.

22          Finally, the prosecutor believed the jurors following Mr. Barnes appeared "a lot better."

23  RT 8974. For the reasons stated above, that reason was also legitimate.

24  **Ms. Scruggs**

25          Ms. Scruggs also expressed conflicting opinions about the death penalty. When asked

26  whether she could impose the death penalty on a non-shooter, she initially said, "I believe that I may

27  have eliminated one of the penalties—the further—." RT 5169. When pressed, she said she would

28  not eliminate the punishment for a non-shooter (*see* RT 5169), but she later reiterated her initial

1  ambivalence, saying that the death penalty is "not necessarily something that I would be able to place

2  on someone that did not actually commit the shooting" (RT 5173).  It is irrelevant that Ms. Scruggs

3  insisted, at other times during voir dire, that she was capable of imposing the death penalty.  Again,

4  conflicting responses about the death penalty justify a peremptory challenge.

5        The prosecutor also dismissed Ms. Scruggs because she was a single mother, and she had

6  been convicted of forgery for twice writing bad checks.  *See* Scruggs Quest. 1, 7; RT 8974-8975.

7  Each of these reasons justified a dismissal.

8        **Ms. Gibson**

9        The prosecutor dismissed Ms. Gibson because: (1) she was "a lawyer," (2) she had

10  previously worked as a teacher (a "liberal" occupation), (3) she had given birth to a child at age 16,

11  (4) she once disfavored the death penalty, (5) she had relatives (including a brother and a son) who

12  had been convicted of crimes, (6) she was a born-again Christian who would be influenced by her

13  religious beliefs, and (7) she "dodged" a question about the felony-murder rule.  *See* Gibson Quest.

14  2-12; RT 6992-6995, 7005, 8977-8978.  As shown above, any of those reasons justified her

15  dismissal.

16        Petitioner quibbles with some of these reasons, noting that: (1) although Ms. Gibson had

17  graduated from law school, she never practiced law, (2) Ms. Gibson's teaching experience was brief

18  and limited to substitute teaching, (3) although some of Ms. Gibson's relatives had suffered criminal

19  convictions, the crimes were not particularly serious and Ms. Gibson believed the justice system had

20  been fair, (4) some of the other jurors not challenged by the prosecutor also had relatives with

21  criminal histories, and (5) although Ms. Gibson had once harbored reservations about the death

22  penalty, her attitude had changed over time.

23        Again, even if petitioner can make a plausible argument that Ms. Gibson might have been

24  favorably disposed toward the prosecution case, the record as a whole supports the prosecutor's

25  dismissal.  The trial judge observed the voir dire and believed the prosecutor's reasons for dismissing

26  Ms. Gibson were reasonable and sincere.  The Court of Appeal agreed.  Opn. at 14.  Two black

27  jurors were included in the final jury panel.  *See U.S. v. Steele*, 178 F.3d at 1236 ("the unchallenged

28  presence of protected class members on the final jury panel undercuts [the] inference of

1  impermissible discrimination"). As a result, there was no *Wheeler/Batson* error.

2  **D.    Other Arguments**

3        Petitioner also contends the trial court failed to properly evaluate the reasons proffered by

4  the prosecutor to determine whether they were bona fide. Specifically, petitioner contends the trial

5  court failed to permit defense counsel to rebut the prosecutor's proffered reasons for his peremptory

6  challenges. Petitioner refers to this colloquy following the first *Wheeler* motion: "The Court: Let's

7  go on to the next juror. [¶] Mr. Traback [counsel for Sifuentes]: Do you want us to respond — [¶]

8  The Court: No. [¶] Mr. Traback: Can we respond afterwards? [¶] The Court: No. This isn't

9  argument. I already made a prima facie finding. You put your statements on the record; now the

10  district attorney has to justify his challenges. That's the way it works." RT 8930-8931.

11        Preliminarily, although the trial court did not allow the defense attorneys to provide

12  rebuttal argument during the first *Wheeler* motion, the attorneys had many later opportunities to

13  make such arguments.   Indeed, the prosecutor's response to the first *Wheeler* motion was

14  comprehensive, and focused heavily on his concern about jurors who had appeared hesitant to

15  impose the death penalty.  The prosecutor reiterated similar concerns for nearly all of the other

16  dismissed jurors.  If any of the defense attorneys believed these reasons were pretextual (or

17  inapplicable to the later-dismissed jurors), the attorneys could have said so during the second and

18  third *Wheeler* hearings. See *People v. Johnson (Jay Shawn)*, 30 Cal.4th 1302, 1309 (2003) (a party

19  asserting a prima facie case of discrimination must show, "from all the circumstances of the case,"

20  a "strong likelihood" that "jurors are being challenged because of their group association"); *see also*

21  *id*. at 1323 (the "circumstances of the case" relevant to a trial court's determination of a prima facie

22  case may include comparative analysis).

23        Perhaps most important, before ruling on the final defense *Wheeler* motion, the trial court

24  invited rebuttal argument from the defense attorneys. *See* RT 8977-8978. At that point, the

25  prosecutor's reasons for dismissing all jurors had been disclosed. If any of the three defense

26  attorneys believed comparative analysis would reveal that the prosecutor had acted with

27  discriminatory intent, the entire record of voir dire was available to support such an argument.

28  Because the defense attorneys simply "submitted" the matter without further argument (RT 8978),

1  petitioner may not complain that he was prohibited from presenting comparative analysis to the trial

2  court.

3          In evaluating petitioner's claim on appeal, the Court of Appeal recognized that some

4  California and federal cases have suggested that ex parte *Batson/Wheeler* proceedings may amount

5  to a denial of due process. Opn. at 15-16, citing *People v. Ayala*, 24 Cal.4th 243, 263 (2000); *United*

6  *States v. Thompson*, 827 F.2d 1254, 9th Cir. 1987. The Court of Appeal nonetheless determined that

7  any error was harmless under either the *Watson* or *Chapman* harmless error standard (*People v.*

8  *Watson*, 46 Cal.2d 818, 836 (1956); *Chapman v. California*, 386 U.S. 18, 24 (1967)), noting that the

9  challenged jurors had been excluded for race-neutral reasons. Opn. at 16. That conclusion is amply

10  supported by the analysis in section IV.C above.

11          Petitioner further argues that the trial court erred in interjecting its own reason for a

12  challenge to Prospective Juror Norman. Again, after the prosecutor explained that he had challenged

13  Mr. Norman because of his views on the death penalty, the trial court stated, "The record should also

14  reflect that he failed to appear on the day that he was scheduled to appear and then we had to

15  reschedule him. [¶] . . . [¶] And then he failed to appear on time and he was an hour late." RT 8933.

16          The Court of Appeal agreed with petitioner that it was improper for the trial court to

17  provide reasons for the prosecutor's exercise of a peremptory challenge. Opn. at 16. As the Court

18  of Appeal observed, "'[I]t does not matter that the prosecutor might have had good reasons to strike

19  the prospective jurors. What matters is the real reason they were stricken.'" Opn. at 16, quoting

20  *Paulino v. Castro*, 371 F.3d 1083, 1090 (9th Cir. 2004). The Court of Appeal nonetheless found the

21  error harmless, given that prior to the trial court's remarks, the prosecutor had already explained that

22  he had exercised a peremptory challenge against Mr. Norman because of his conflicting views on

23  the death penalty. Opn. at 16. Because the record supports that stated justification, the trial court's

24  recognition of yet another reason to dismiss Mr. Norman was meaningless.

25          Petitioner also argued that the trial court had erred in permitting the prosecutor to

26  incorporate by reference the questionnaires and voir dire of the prospective jurors into his statement

27  of reasons. The Court of Appeal found no error, noting that the prosecutor gave lengthy statements

28  for excusing each of the prospective jurors, and the record supported his justifications. Opn. at 16-

17.

# CONCLUSION

For the reasons stated, we ask that the petition for writ of habeas corpus be denied.

Dated:  October 29, 2007

                   Respectfully submitted,

                   EDMUND G. BROWN JR.
                   Attorney General of the State of California

                   DANE R. GILLETTE
                   Chief Assistant Attorney General

                   GERALD A. ENGLER
                   Senior Assistant Attorney General

                   PAMELA K. CRITCHFIELD
                   Deputy Attorney General

                   /S/

                   JOHN H. DEIST
                   Deputy Attorney General

                   Attorneys for Respondent

20111344.wpd
SF2007402360

## DECLARATION OF SERVICE BY U.S. MAIL

Case Name:  *Vasquez v. Felker*

No.:  **C 07-4250 WHA (PR)**

I declare:

I am employed in the Office of the Attorney General, which is the office of a member of the California State Bar, at which member's direction this service is made.  I am 18 years of age or older and not a party to this matter.  I am familiar with the business practice at the Office of the Attorney General for collection and processing of correspondence for mailing with the United States Postal Service.  In accordance with that practice, correspondence placed in the internal mail collection system at the Office of the Attorney General is deposited with the United States Postal Service that same day in the ordinary course of business.

On <u>October 29, 2007</u>, I served the attached **(1) ANSWER TO PETITION FOR WRIT OF HABEAS CORPUS; (2) MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ANSWER TO PETITION FOR WRIT OF HABEAS CORPUS; (3) NOTICE OF LODGING OF, AND INDEX TO, EXHIBITS** by placing a true copy thereof enclosed in a sealed envelope with postage thereon fully prepaid, in the internal mail collection system at the Office of the Attorney General at 455 Golden Gate Avenue, Suite 11000, San Francisco, CA  94102-7004, addressed as follows:

**Ruben Vasquez**
**T-95390/ C1-116 U**
**High Desert State Prison**
**P.O. Box 3030**
**Susanville, CA 96127-3030**

I declare under penalty of perjury under the laws of the State of California the foregoing is true and correct and that this declaration was executed on October 29, 2007, at San Francisco, California.

| Susan Chiang | |
| --- | --- |
| Declarant | Signature |

20111514.wpd